```
1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF MISSISSIPPI

3
    UNITED STATES OF AMERICA,      )
4                                  )
              Plaintiff,           )       CASE NO. 4:15CR66
5                                  )
              vs.                  )
6                                  )
    LAURA LYNN THOMPSON,           )
7                                  )
              Defendant.           )
8   _____

9
                 SENTENCING AS TO COUNT 1 OF THE INFORMATION
10                  BEFORE DISTRICT JUDGE MICHAEL P. MILLS
                   THURSDAY, FEBRUARY 18, 2016; 1:35 P.M.
11                          OXFORD, MISSISSIPPI

12  FOR THE GOVERNMENT:

13       United States Attorney's Office
         CLAY DABBS, ESQ.
14       900 Jefferson Avenue
         Oxford, Mississippi  38655-3608
15


16  FOR THE DEFENDANT:

17       McGee & Bogen
         EDWARD J. BOGEN, JR., ESQ.
18       Post Office Drawer 31
         Leland, Mississippi 38756-0031
19
         Tannehill, Carmean, & McKenzie, PLLC
20       JACOB BYSTROM JORDAN, ESQ.
         829 N. Lamar Boulevard, Suite 1
21       Oxford, Mississippi 38655

22       Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23  _____
                RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
24                   FEDERAL OFFICIAL COURT REPORTER
                   911 JACKSON AVENUE EAST, SUITE 369
25                      OXFORD, MISSISSIPPI 38655
```

```
 1     (CALL TO ORDER OF THE COURT)
 2          THE COURT:  All right.  Mrs. Pennebaker, you want to
 3 call the docket.
 4          THE COURTROOM DEPUTY:  Court calls Cause No.
 5 4:15CR66, United States of America v. Laura Lynn Thompson.
 6 This is a sentencing as to Count 1 of the information.
 7          THE COURT:  All right.
 8     Who do we have for the Government?
 9          MR. DABBS:  Clay Dabbs, Your Honor.
10          THE COURT:  And for the defense?
11          MR. BOGEN:  Jacob Jordan and Josh Bogen, Your Honor.
12          THE COURT:  Well, we're glad to have you.
13     Anyone from probation?
14          MR. ANDERSON:  Blaine Anderson, Your Honor.
15          THE COURT:  All right.
16     Do you have your client with you, Mr. Bogen?
17          MR. BOGEN:  Yes, sir.
18          THE COURT:  Have you reviewed the Presentence Report
19 with your client?
20          MR. BOGEN:  Yes, sir.
21          THE COURT:  Do you have any unresolved objections?
22          MR. BOGEN:  No, Your Honor.
23          THE COURT:  Are you ready to proceed with the
24 sentencing?
25          MR. BOGEN:  Yes, Your Honor.
```

 1          THE COURT: If you would come forward, please.

 2     (PARTIES COMPLYING).

 3          THE COURT: All right. Ms. Thompson, on a previous

 4 day, you pled guilty to Count 1 of the information, which

 5 charged you with conspiracy to commit healthcare fraud. You

 6 are now before the Court for sentencing. And, before you are

 7 sentenced, is there anything you would like to say?

 8          THE DEFENDANT: Yes, sir, Your Honor. I want to

 9 thank you for allowing me to speak. I truly regret my actions

10 and any harm it may have caused, and I -- as in my Presentence

11 Report, I am the primary caregiver for my mother, father, and

12 father-in-law, which are totally dependent upon me for care.

13     And, prior to this, I worked 24 years as a nurse with

14 no -- no wrong actions. I was drawn into this case of fraud.

15 I am truly sorry. I accept responsibility. Also, I'm the

16 primary source of income for my entire family. They are

17 totally dependent upon me for that.

18     I own an adult day care, which I'm partners with, with my

19 son; and I play a big role in that business. And that is my

20 means of support and my mean of repaying any restitution that

21 the Court may see fit. And, again, I am truly sorry and accept

22 full responsibility.

23          THE COURT: All right.

24     Mr. Bogen? Did you have anything to say?

25          MR. BOGEN: Your Honor, we have a very close friend

1 in the courtroom who would like to make a brief statement to
2 the Court on her behalf.  I've mentioned that to Mr. Dabbs, and
3 I don't think there's any objection to it if Your Honor please.
4         THE COURT:  All right.
5         MR. BOGEN:  And Jacob will speak on behalf of
6 Ms. Thompson.
7         THE COURT:  Okay.
8         MR. BOGEN:  Tell the Judge who you are and what your
9 name is.
10         MS. HOLMES:  My name is Cathy Holmes, and Laura's
11 parents are my godparents.  I'm a friend of the family.
12         MR. BOGEN:  Go ahead and make your statement.
13         MS. HOLMES:  I come to ask the Court for leniency
14 today on behalf of my godsister, Laura, and her extended
15 family.  Her mother and father are both very ill, and Laura is
16 the primary caregiver for them.  Ms. Penny, Laura's mother, my
17 godmother, is paralyzed; and she has to have total care
18 throughout the day.
19     My godfather has recently had surgery and will require
20 several more surgeries.  Laura's husband is disabled.  Her
21 father-in-law also lives with them, and he is disabled.  And
22 all of them depend on her financially and physically, and I beg
23 the Court for mercy for my family today.
24         THE COURT:  Where do you work?
25         THE DEFENDANT:  I'm an adjuster, crop insurance

1  adjuster.  I've worked for ARMtech Crop Insurance for ten
2  years.  And I've been a part of Laura's family for about 25.
3  They're really good people.  And Laura's just an exceptional
4  person.  You know, we all make mistakes.  And, so, I ask for
5  this Court to provide mercy on her behalf.
6           THE COURT:  All right.
7           MR. BOGEN:  Thank you, Your Honor.
8           MS. HOLMES:  Thank you.
9           THE COURT:  Mr. Jordan, did you have something you
10 wanted to say?
11          MR. JORDAN:  Yes, sir, Your Honor.  There are three
12 primary considerations that I hope you will find relevant as
13 you fashion a sentence for Laura here today.  The first, simply
14 put, is her life.  She's led a life of -- as best characterized
15 as a life of service, a life of humility, and a life of humble
16 origins.
17      About 30 years ago, she became a nurse knowing good and
18 well she wouldn't make just a whole lot of money doing it; and,
19 indeed, she didn't.  But she's always said that it was her
20 calling to serve; and, indeed, she did honorably for 24 or 25
21 some-odd years, focusing almost entirely on the elderly
22 population of the Delta.
23      And, in addition to serving countless patients, Your
24 Honor, in her professional capacity, she's always been an
25 active citizen in her community, buying food in bulk at Dollar

1  General and giving it to people, something of a food pantry,

2  you might even call it.  Adopting a family every Christmas to

3  provide food and gifts.  She's a person that says What can I do

4  for someone else?  She gives through and through, and that's

5  just who she is.

6       Now, I cannot stand here and say that she's a saint, and

7  that's not why I'm here.  But I do wish to impress upon Your

8  Honor that she's a fundamentally good person, not a mean bone

9  in her body.  Through and through, she's a good person who

10 ultimately succumbed to that which has foiled mankind through

11 the generations; and that is money.

12      Never had much money to speak of.  And, in 2011, she

13 needed a job and found one at Sandanna Hospice with Sandra

14 Livingston.  And there was already a fraud in place, a scheme

15 in place, when she was hired.  And I don't say that to minimize

16 her culpability; there's no question she participated in it.

17      But, finally, she had something that could pay the bills.

18 And I want to point out, for what it's worth, while

19 coconspirators in this scheme have led lavish million-dollar

20 lifestyles, Laura stayed true to her humble origins.  Now, I've

21 not been to her home; but Josh, my co-counsel, has been.  And,

22 to put it quite charitably, she does not lead a lavish

23 lifestyle.

24      So I ask you to consider the person she has been through

25 and through.  Because her activity in this scheme is a complete

 1  departure from who she is.  Money made a follower out of
 2  someone who we could look up to as a leader in every other
 3  facet of her life.
 4      The second big factor I hope you will consider is her
 5  degree of cooperation with the Government.  I don't want to
 6  speak for Mr. Dabbs or the investigators, but I think we all
 7  agree that her cooperation has been quite substantial.
 8      As soon as she was targeted, and before any promises were
 9  put on the table, she met with investigators at the U.S.
10  Attorney's Office for hours on end.  She put it all on the
11  table, not knowing whether any promises would ever be made in
12  return.
13      Subsequently, the Government filed a 5K motion for a
14  downward departure.  And, even after that, Ms. Thompson met
15  with the U.S. Attorney's Office and federal agents again
16  helping -- assisting with this case.
17      Now, Your Honor, that's important retroactively but,
18  also -- retrospectively but, also, prospectively.  She is --
19  there is a much larger class of players in this scheme that
20  have yet to be brought to justice, and her cooperation will be
21  the linchpin in bringing them to justice.
22      In short, there are bigger fish to fry.  And I mean --
23  when I say "big fish," I mean that in a few different ways;
24  but, for now, I mean it in the sense that they are the
25  gatekeepers to this whole scheme.  Without them, it is highly

1 unlikely that such a scheme would ever take place.

2 　　　So I've mentioned her life and her cooperation and not
3 only the 5K motion, but there's one other factor which warrants
4 a departure under the guidelines downwardly.  And that is her
5 essential support, both financially and in the caregiving
6 capacity, that she provides to her family in Ruleville.

7 　　　I've got to say, Your Honor, I think I'm more worried
8 today about what happens to Laura than Laura is.  I've never
9 once heard her express concern over what's going to happen to
10 her.  She's always said "I can take whatever he gives me."  But
11 what she constantly talks about is what will happen to my
12 family?

13 　　　And that's consistent with the person she's been her whole
14 life, worrying about other people, other than herself.  Her
15 mother, as you've heard, is completely bedridden and wheelchair
16 bound.  Her father and her father-in-law -- all of whom live
17 with her in this house that is not so lavish, as I previously
18 mentioned.  They can't afford a professional medical provider
19 to care for them.

20 　　　　　THE COURT:  Do her two sons live there also?

21 　　　　　MR. JORDAN:  I don't know.

22 　　　　　THE DEFENDANT:  Only one lives with his daddy, Your
23 Honor.  My other one has his own home.  He's the one that's
24 partners with me in the day care, and my other child is still
25 dependent.  You know, he works --

```
 1            THE COURT:  How old is he?
 2            THE DEFENDANT:  He's 20.
 3            THE COURT:  Does he work anywhere?
 4            THE DEFENDANT:  Yes, sir.  He's working with my
 5   brother.  They do roofing; and, you know, of course, it varies
 6   with their work, so he's still dependent upon us, you know, for
 7   some support.
 8            THE COURT:  All right.  Sorry to interrupt.
 9            MR. JORDAN:  No problem, Your Honor.  Well, in
10   addition to her caregiving capacity, she's the sole financial
11   supporter of these people, of her family.  And that support
12   comes from an adult day care that she opened a couple of years
13   ago, and she is the primary manager and consultant that
14   oversees the operations of that adult day care.  Her son is
15   also heavily involved.  Without her participation, that day
16   care crumbles.  And, without that day care --
17            THE COURT:  Does it receive federal funds?
18            THE DEFENDANT:  State.
19            MR. JORDAN:  State.  So, without that day care and
20   without that income, there's no money to pay restitution.
21   There's no money to pay this -- to support this family that's
22   in need of it, which -- and by the way, Your Honor,
23   Ms. Thompson has been questioned about the operations of that
24   day care; and there's no known indication that there's any
25   underhanded operating or billing or charting that's going on.
```

1 　　　In essence, she's not prone to repeating this offense in
2 her capacity as a manager for this adult day care. Now, the
3 guidelines, at first blush, 5H1.6 seem to suggest that the
4 needs of her family may not be completely relevant. But, when
5 you get down into the comments, it makes very clear that a
6 downward departure under the guidelines, 5H1.6 specifically, is
7 completely applicable to this situation.
8 　　　So, Your Honor, I won't make any bones about why I'm here
9 and what I'm requesting. It is our sincere hope, and we plead,
10 that a sentence can be handed down short of imprisonment that
11 involves some mixture of -- combination of probation or for
12 home confinement or community confinement. Her family needs
13 her. Her community benefits from her participation. And she's
14 led a good life.
15 　　　For what it's worth, Your Honor, I've gotten to know Laura
16 quite well over the last year; and I have witnessed, firsthand,
17 her genuine -- in fact, I would also say her agonizing remorse
18 over her participation in this whole scheme. It's just simply
19 not who she is.
20 　　　She fell into the wrong hole; and, instead of getting out
21 of it, she stayed in there for a little while and did some
22 wrong. She's a fundamentally good person. She did a bad
23 thing. And I hope you'll take these things into consideration
24 as you fashion your sentence here today.
25 　　　　　　THE COURT: All right. Thank you.

    1     Mr. Dabbs, you have anything to say?

    2         MR. DABBS: Just briefly, Your Honor. We have filed

    3  a 5K motion on behalf of Ms. Thompson. She -- when we

    4  confronted her and indicated that she was looking at being

    5  charged in health care fraud, she met with us with her

    6  attorneys and agreed to plead guilty to an information so we

    7  did not have to present the case to the grand jury.

    8     Her cooperation has been helpful. One individual, Patrick

    9  Pendleton has been charged. He has pled guilty. He has not

  10  been sentenced. That's not based entirely on Ms. Thompson;

  11  but, certainly, her cooperation played a role in that.

  12     And we would expect her cooperation to lead, at least in

  13  part, to some additional charges that we hope to bring in the

  14  future. So we have filed a 5K on her behalf and ask the Court

  15  to depart from the guidelines.

  16         THE COURT: All right.

  17     Well, I'm about to state the reasons for your sentence,

  18  Ms. Thompson. I will adopt the Presentence Investigation

  19  Report without change. Under the statute, you could receive up

  20  to 10 years in the penitentiary, up to a $250,000 fine; 0 to

  21  3 years' supervised release; and a $100 special assessment.

  22     Under the guidelines, you have a total offense level of

  23  15, a criminal history category of Roman Numeral I. The

  24  guidelines provide for a range of 18 to 24 months and a

  25  supervised release range of 1 to 3 years with a fine of 7,500

1  up to 75,000 dollars.  The fine will be waived because of your

2  inability to pay.

3       And the sentence to be imposed will be below the guideline

4  range based on the Government's motion that was filed on your

5  behalf because of your substantial assistance.  I find the

6  total amount of restitution to be $1,008,463.32.

7       In this case, we're going to assign a portion of that to

8  you, partial restitution of $271,775.30 for which you are

9  solely responsibility; and $736,688.02 for which you're jointly

10 and severally responsible with Sandra Livingston in related

11 Case No. 3:15CR00007-1, Northern District of Mississippi.

12      I have considered the advisory guideline range, the

13 statutory penalties, and the sentencing factors of 18 USC

14 Section 3553(a); and I'm going to impose a sentence outside the

15 advisory guideline range because the factors for departure as

16 found are of the kind contemplated by the Sentencing

17 Commission.

18      When I started reading your offense report, I was,

19 frankly, astonished.  Of all people to take advantage of, old

20 people, sick people, the Medicare and Medicaid programs that

21 are there to help people who genuinely need hospice care.  I

22 can't think of a more vulnerable group of people to take

23 advantage of.

24      And I can't think of a more cynical, self-serving scheme

25 than the one you participated in.  And it began, as far as I

1 can tell -- you went into a -- partnered with a lady,
2 Ms. Kimberly Sims, and Monette Hospice and shared office space.
3 You were paid $85 an hour at that time to see hospice patients
4 as an LPN.
5      You noticed the patients were coming "in droves" and
6 realized that they were living well past six months.  In fact,
7 many of them are still alive.  This was in 2006.  You did
8 confront Sims and were relegated to answering the phones and
9 monitoring the nurses' schedules.
10      But you began to educate yourself on Medicare and Medicaid
11 regulations.  You observed Ms. Sims pay doctors' offices for
12 names and phone numbers of people who could be enrolled in this
13 hospice care.
14      Monette would then bill Medicare or Medicaid for hospice
15 services for those patients, whether they came or not, whether
16 they needed it or not.  Monette began to get in financial
17 trouble, and a state survey was undertaken; and you left the
18 day of the state survey.  That was in 2008.
19      2009, you opened Milestone Hospice, Incorporated, and
20 worked with a gentleman named Ronnie Respess, who you knew from
21 Monette.  And I -- let's see.  You had a -- Minnie Pearl Harvey
22 is one name that jumps out here that was on hospice in at least
23 2012, and that person was not terminally ill and is still alive
24 today.
25      Your friend, Mr. Respess would bill Harvey's Medicare for

1  hospice; and, when the payments came in, he would give Harvey
2  one-half of the money in cash.  Mr. Harvey stayed on hospice
3  care for 875 days.
4  　　　　You then became a -- let's see.  A Mr. Zeyad Kassem of
5  Michigan opened a new hospice called Delta Soul, and you were
6  hired to get it up and running because he did not know what he
7  was doing.  The patients for Delta Soul were already
8  established before the business opened.
9  　　　　You had a meeting, a staff meeting, where it appeared that
10 many of the notes had been altered, including your notes had
11 been altered; and you pointed out the violations and ended your
12 employment with Delta Soul.
13 　　　　You then joined with a lady named Sandra Livingston at a
14 business called Sandanna Hospice and became a recruit to get
15 patients.  Which, these are noneligible patients where you
16 billed Medicare and Medicaid for unnecessary hospice services.
17 　　　　And you became one of the biggest recruiters that this
18 person had ever dealt with.  You were paid $3,000 a week for
19 your recruiting.  Some doctors got involved, Dr. Brown.  You
20 were paying them cash for patients.
21 　　　　Then you opened Milestone Hospice, Part II with your old
22 business partner Ronnie Respess and got a Dr. Nelson involved,
23 I think.  And I was, frankly, surprised to see a letter from
24 Ronald Respess testifying to your integrity.
25 　　　　After Milestone II, you began operating your own business

1  Reflections Adult Day Care.  Let's see.  At Milestone II, you

2  would have chart parties where you would direct others to

3  falsify documents; and people would get together, apparently,

4  and falsify records for Medicare and Medicaid, government

5  payments.

6       When Milestone II was audited, only seven out of the 23 or

7  24 charts that were audited were legitimate.  So I guess about

8  75 percent of the charts were not legitimate.  You would

9  receive 100 to 200 dollars per day for helping with the chart

10 parties.

11      It is a remarkable scheme, and it's very disappointing

12 that the very limited resources that the Government has to help

13 people who are truly needy -- that they can be misapplied so

14 easily.  I don't know how much further we can go if we continue

15 to just allow money to be so misused.

16      That having been said, I think you are entitled to some

17 credit for coming forward and agreeing to participate in the

18 investigation; and the Government has filed a motion on your

19 behalf.

20      So, pursuant to the Sentencing Reform Act of 1984, it is

21 the judgment of the Court that the defendant, Laura Lynn

22 Thompson, is hereby committed to the custody of the Bureau of

23 Prisons to be imprisoned for a term of 13 months on Count 1 of

24 the information.

25      Upon release from imprisonment, the defendant shall be

1  placed on supervised release for a term of three years.  The
2  defendant shall comply with the following mandatory conditions:
3  You shall not possess a firearm, destructive device, or any
4  other dangerous weapon.
5       You shall cooperate in the collection of DNA as directed.
6  The mandatory drug-testing condition is waived.  You shall
7  comply with the standard conditions that have been adopted by
8  this Court and the following special conditions:  you shall not
9  incur new credit charges or open additional lines of credit
10 without approval of the probation officer.
11      You shall provide the probation officer with access to any
12 requested financial information.  Restitution in the amount of
13 1,008,463.32 shall be made directly to the U.S. District Court
14 Clerk's Office, Northern District of Mississippi, for
15 disbursement to the victim, Medicare Division of Accounting
16 Operations in Baltimore, Maryland.
17      Payments to begin immediately in equal monthly
18 installments while incarcerated.  Any balance remaining upon
19 release from incarceration shall be paid in equal monthly
20 installments as determined by the application of the criminal
21 monetary payment schedule adopted by this court.
22      The defendant is solely responsible for $271,775.30 in
23 restitution.  She is jointly and severally responsible for
24 736,688.02 with the related case of Sandra Livingston.  It is
25 further ordered that she shall pay to the U.S. District Court

1  Clerk's Office, Northern District of Mississippi, a special
2  assessment of $100 which is due immediately.
3      Pursuant to the plea agreement filed in this case, the
4  defendant has waived all rights to appeal the conviction and/or
5  sentence imposed and the manner in which the sentence was
6  imposed on any ground whatsoever, including, but not limited
7  to, the grounds set forth in 18 U.S.C. Section 3742.
8      The defendant also waived all rights to contest or
9  collaterally attack the conviction or sentence in any
10 postconviction proceedings, including, but not limited to, any
11 motion brought pursuant to 28 U.S.C. Section 2255.
12     Do you understand the sentence I have just stated?
13         THE DEFENDANT:  Yes, sir.
14         THE COURT:  You want to remain out on bond today
15 or --
16         THE DEFENDANT:  Yes, sir, please.
17         THE COURT:  All right.  I'm going to let you remain
18 out on your same bond, and the institution will be designated
19 for you.  Do you think you can get there on your own?
20         THE DEFENDANT:  Yes, sir.
21         THE COURT:  I'm going to designate Monday, April
22 the 18th, 2016, as the date for you to report.  And so that we
23 have a record, I'm going to ask you to sign a voluntary
24 surrender form; and your attorney may witness it.
25         MR. BOGEN:  Your Honor, in your order, can you

1 recommend that she -- that the Bureau of Prisons attempt to
2 place her as close as possible to her family residence?
3          THE COURT: I will make that request to the facility
4 nearest to --
5          MR. BOGEN: Ruleville.
6          THE COURT: The Ruleville community?
7          MR. BOGEN: Uh-huh.
8          THE COURT: That's not a direction, but it will be a
9 request. I can't tell them.
10      Anything else?
11          MR. DABBS: Nothing from the Government.
12          MR. BOGEN: No.
13          THE COURT: All right. You're now excused. The
14 Court will be in recess.
15             (THE HEARING ENDED AT 2:04 p.m.)

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4        I, Rita Davis Young, Federal Official Realtime

5   Court Reporter, in and for the United States District Court for

6   the Northern District of Mississippi, do hereby certify that

7   pursuant to Section 753, Title 28, United States Code that the

8   foregoing is a true and correct transcript of the

9   stenographically reported proceedings held in the

10  above-entitled matter; and that the transcript page format is

11  in conformance with the regulations of the Judicial Conference

12  of the United States.

13

14

15                    Dated this 16th day of March, 2016.

16

17

18

19                    /s/ Rita Davis Young
                      RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
20                    Federal Official Court Reporter

21

22

23

24

25